IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:05CR156 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | |
| JULIO VALERA-RAMIREZ and | ) | |
| CESAR LIZARRAGA-CASTRO, | ) | RECOMMENDATION |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the motion of defendants Julio Valera-Ramirez (Valera-Ramirez) (Filing No. 16) and Cesar Lizarraga-Castro (Lizarraga-Castro) (Filing No. 13) to suppress all evidence seized and statements taken following a traffic stop on Interstate 80 in Lincoln County, Nebraska, by the Nebraska State Patrol (NSP) on March 30, 2005. Both Valera-Ramirez and Lizarraga-Castro are charged in an Indictment with a conspiracy to distribute and possess with intent to distribute in excess of 500 grams of methamphetamine in violation of 21 U.S.C. § 846 (Count I) and with the possession with intent to distribute in excess of 500 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1) (Count II).

The court held evidentiary hearings on the motions to suppress on June 9 and July 6, 2005. During the hearings, the court heard the testimony of NSP Troopers Ryan Hayes (Trooper Hayes) and Dan R. Covert (Trooper Covert), and Sidney Hooper (Mr. Hooper), a retired special agent of Immigration and Customs Enforcement (ICE). The court received into evidence the following: Exhibit 1, a rental agreement for a Dodge pickup; Exhibit 2, a permission for search form; Exhibit 101, a videotape of a traffic stop; Exhibit 102, a permission for search form; and Exhibit 103, a NSP permission for search form. A transcript (TR.) was prepared and filed in this matter on July 19, 2005 (Filing No. 28).

**FINDINGS OF FACT**

On March 30, 2005, Trooper Hayes was assigned to NSP Troop D and was working the day shift by patrolling Interstate 80 east of North Platte, Nebraska (TR. 5). Trooper Hayes

was in uniform and driving a marked NSP patrol vehicle. Trooper Hayes, traveling westbound, observed an eastbound silver quad cab Dodge pickup which was missing a front license plate (TR. 6). Trooper Hayes did observe the rear license plate as he passed and noted the license plates were from Nebraska (TR. 57). Trooper Hayes believed the pickup was in violation of Nebraska law requiring a license plate mounted on both the front and rear of the vehicle (TR. 7). Trooper Hayes testified he also recalled a NSP broadcast, from a week earlier, which broadcast a watch from the NSP in Omaha to be on the lookout for a silver quad cab Dodge pickup that was possibly involved in the transportation of narcotics (TR. 7). The broadcast included information that the silver quad cab Dodge pickup was occupied by two males and one female and was to return to the Omaha or Fremont area around the 24th of March (TR. 8). Trooper Hayes turned around in the median and caught up to the pickup (TR. 8). Trooper Hayes noticed a rear Nebraska license plate on the pickup and radioed in a wanted check on that numbered plate before he stopped the pickup (TR. 13). The check came back as plates not on file (TR. 13).

Trooper Hayes activated his red and blue emergency lights and stopped the pickup (TR. 8)[1]. The pickup pulled to the side of the Interstate without incident (TR. 8). There were two occupants of the pickup, the driver, Valera-Ramirez, and a passenger, Lizarraga-Castro (TR. 8). Trooper Hayes walked to the passenger side of the pickup and asked the driver for a driver's license, registration, proof of insurance, and informed the driver of the reason for the stop (TR. 8). Trooper Hayes immediately noted a language barrier in that the occupants spoke Spanish and Trooper Hayes did not (TR. 9). Trooper Hayes received a Mexican identification card from each and a copy of a rental agreement for the pickup (TR. 9). Suspecting the occupants were undocumented aliens, Trooper Hayes then asked for social security cards, passports, or any other documents to show that the occupants were legally in the United States (TR. 9-10). Valera-Ramirez and Lizarraga-Castro had no other documents or identification (TR. 10). Trooper Hayes took the Mexican identification cards, the rental

---

[1]After Trooper Hayes turned on his emergency lights, Trooper Hayes's patrol vehicle's camera and audio were activated. The entire traffic stop, tow, and canine sniff at the ICE garage were recorded on a videotape which the court viewed and listened to in arriving at the findings of facts in this matter (Exhibit 101).

agreement, and had the driver, Valera-Ramirez, come back and be seated in the front seat of Trooper Hayes's patrol vehicle (TR. 11).

Trooper Hayes attempted to have a conversation with Valera-Ramirez as to Valera-Ramirez's travel itinerary but was unable to fully communicate with him due to the language barrier (TR.15). Trooper Hayes checked with the passenger Lizarraga-Castro, who spoke a little more English than Valera-Ramirez, but was still unable to obtain much information (TR. 15). Trooper Hayes was told by Lizarraga-Castro that Valera-Ramirez and Lizarraga-Castro had been in Denver painting a house and were heading back to Fremont, Nebraska, when Trooper Hayes stopped them (TR. 15). Lizarraga-Castro was unable to tell Trooper Hayes who had rented the pickup (TR. 15). Trooper Hayes returned to this patrol vehicle and attempted to contact Sergeant Santos of the Colorado State Patrol (TR. 15). Trooper Hayes was handed Sergeant Santos' business card by either Valera-Ramirez or Lizarraga-Castro when they provided papers to Trooper Hayes (TR. 15). Apparently, Sergeant Santos had made contact with the pickup earlier in the day (TR. 16). Trooper Hayes wanted to talk with Sergeant Santos and find out why the pickup had been stopped and what sort of information Sergeant Santos had received from them (TR. 16). Trooper Hayes was unable to reach Sergeant Santos (TR. 17). Trooper Hayes issued a violation card to Valera-Ramirez for the missing front license plate (TR. 14).

Trooper Hayes had concerns about the status of the pickup (TR. 17). The rental agreement indicated the pickup was rented on the 21st of March and was due back in Fremont on the 28th of March, two days before the traffic stop (TR. 17). Further, the pickup was rented to a Brenda Medina, not to either of the occupants (TR. 17; Exhibit 1). Although not noticed at the time of the stop by Trooper Hayes, the rental agreement reflected, which was partially obscured, an authorized driver with the name of Julio Ramirez (Exhibit 1; TR. 17). The rental agreement also reflected the pickup would be "en route to Minn" (Exhibit 1). Trooper Hayes made a telephone call to the Enterprise Rent-A-Car Fremont office listed on the rental agreement to determine if the two occupants of the pickup were authorized to have the pickup (TR. 17). Trooper Hayes talked to Pam at Enterprise Rent-A-Car who stated that she had a private investigator looking for the vehicle along with its occupants (TR. 18).

Trooper Hayes then talked with the private investigator, Paul, to no avail (TR. 18).  Trooper Hayes also spoke by telephone with NSP Sergeant Dan Doggett to determine if the pickup was the pickup the NSP was looking for in the narcotics investigation watch broadcast earlier in the week (TR. 19).  When Trooper Hayes was at the pickup earlier he noted two air fresheners hanging from the rearview mirror, two small bags in the back seat, an atlas, a cell phone, and numerous food wrappers inside the pickup (TR. 19).  Trooper Hayes did not see any painting supplies (TR. 20).  Trooper Hayes radioed for an ICE agent come to the scene as he suspected both Valera-Ramirez and Lizarraga-Castro to be illegally in the United States (TR. 20).

Agent Hooper from the North Platte ICE office responded to Trooper Hayes's request (TR. 115).  Mr. Hooper recalled the request came through the NSP dispatch operator who stated that Trooper Hayes had stopped a vehicle, that Trooper Hayes suspected the occupants were illegal aliens, and that Trooper Hayes was requesting ICE assistance in interpreting and determining the occupants' alienage (TR. 115).  Agent Hooper spoke functional Spanish learned from his training and twenty-seven years of immigration duties with the Border Patrol, INS, and ICE, along with his prior experience with the Marine Corps in Argentina (TR. 114).  Agent Hooper arrived at the scene of the Interstate stop, spoke briefly with Trooper Hayes, and then spoke, in turn, to Valera-Ramirez and Lizarraga-Castro (TR. 115-116).  Agent Hooper spoke to both subjects in Spanish, identified himself as an immigration officer, and inquired as to their citizenship and whether either of them had any documents to be legally in the United States (TR. 116).  Agent Hooper did not advise either of the subjects of their *Miranda* rights (TR. 128).  Both Valera-Ramirez and Lizarraga-Castro stated they had no documents and admitted they were not legally in the United States (TR. 116).  Agent Hooper placed both Valera-Ramirez and Lizarraga-Castro in custody and directed that both individuals be taken to the ICE office in North Platte about 10-11 miles away (TR. 117).  Agent Hooper transported Lizarraga-Castro to the ICE office in North Platte, while Trooper Hayes remained at the scene with the vehicle and Valera-Ramirez until a wrecker arrived to tow the pickup (TR. 22).  Trooper Hayes testified it was NSP policy that if all occupants of a vehicle were being detained, the vehicle must be towed (TR-22).

Previously, Trooper Covert, a canine handler, whose base was in Lexington, Nebraska, had been called to the scene on the Interstate (TR. 151). By the time Trooper Covert arrived at the scene on the Interstate with his drug detection dog, Zoran, the pickup was being loaded onto the tow truck for the transport to the North Platte ICE offices (TR. 151). The pickup was towed to the ICE garage in North Platte, Nebraska, and Trooper Covert followed the tow truck (TR. 152). Upon arrival, the pickup was removed from the tow truck and parked in a bay of the ICE garage (TR. 152). Trooper Hayes requested that Trooper Covert deploy his canine and sniff the pickup (TR. 153). Trooper Covert deployed Zoran, an aggressive indicator dog that barks, bites, and or scratches when detecting a narcotics odor (TR. 154). Zoran alerted to the pickup and indicated by jumping through an open window and becoming frantic at the accelerator and front dash area until Trooper Covert removed Zoran from the pickup (TR. 155-56).

Meanwhile, Valera-Rivera and Lizarraga-Castro were held in separate detention cells at the ICE office in North Platte, Nebraska (TR. 72). Agent Hooper, at Trooper Hayes's request, talked separately with Valera-Rivera and Lizarraga-Castro and obtained a consent to search of the pickup by having Valera-Rivera and Lizarraga-Castro, in turn, sign a NSP Permission to Search form (Exhibits 2 and 102A; TR. 117). Agent Hooper did not tell either of the individuals about the dog sniff prior to getting their signatures on the forms (TR. 137). The forms were read to them in Spanish by Agent Hooper and Valera-Rivera and Lizarraga-Castro were told they had a right to refuse the permission to search (TR. 117-118). Each defendant said he understood the form and signed the form giving permission to search the pickup (TR. 118; 137). The actual search of the pickup was conducted after the consents were obtained (TR. 158). Found in the pickup were four and a half pounds of methamphetamine which were located in the dash area of the pickup (TR. 159).

## LEGAL ANALYSIS
### A. The Traffic Stop

"[A] police officer who personally observes a traffic violation has probable cause to stop the vehicle." ***United States v. $404,905.00 in U.S. Currency,*** 182 F.3d 643, 646 (8th

Cir. 1999) **citing *Pennsylvania v. Mimms***, 434 U.S. 106, 109 (1977).  Nebraska law provides:

> Except as otherwise specifically provided, no person shall operate, drive, or park or cause to be operated, driven, or parked a motor vehicle on the public highways unless such vehicle at all times has displayed one number plate on the back thereof and one number plate on the front thereof, which plates shall be furnished for it as hereinbefore provided.

Neb. Rev Stat. § 60-323. Trooper Hayes observed the pickup did not have a front license plate as it approached him from the opposite direction on Interstate 80 and did notice a Nebraska license plate on the rear as the pickup passed him by. This violation constituted probable cause for Trooper Hayes to turn around on the Interstate and stop the pickup truck. The fact that Trooper Hayes had received an alert on a similar type of pickup involved in drug activity is irrelevant to the traffic stop. "Even assuming [the police officer] was looking for [the defendant], it would be 'objectively reasonable' to pull over a vehicle which was" engaging in a traffic offense. ***United States v. Miller***, 20 F.3d 926, 929 (8th Cir. 1994). Accordingly, Valera-Ramirez's and Lizarraga-Castro's assertion that they were illegally stopped by Trooper Hayes on March 30, 2005, is without merit.

## B. The Roadside Detention

Contemporaneous with a valid traffic stop, a police officer may detain the motorist while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and issuing a citation. ***$404,905.00***, 182 F.3d at 647; **see also *United States v. Sokolow***, 490 U.S. 1, 7 (1989). Additionally, the police officer may inquire about the motorist's destination, purpose of the trip and whether the police officer may search the vehicle. ***$404,905.00***, 182 F.3d at 647; ***United States v. Allegree***, 175 F.3d 648, 650 (8th Cir. 1999). The police officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made the police officer regarding illegal drug use, and divergent information from the passengers. ***$404,905.00***, 182 F.3d at 647; ***Allegree***, 175 F.3d at 650-

51. In this case, Trooper Hayes was faced with a driver without a driver's license, a rental agreement for a vehicle which was past due, a license plate which came back "not on file" when an inquiry was made, an explanation by the passenger that the occupants of the pickup were painting a house in Colorado with no painting equipment in the pickup, obvious air fresheners hung in the pickup, occupants with minimal identification, and knowledge of an alert to be on the lookout for a similar pickup involved in recent drug activity.  Further, Trooper Hayes suspected the two occupants of the pickup were in the United States illegally because of the occupants' inability to communicate in English and the lack of identification documents.

Trooper Hayes may convert the traffic stop into a valid investigatory stop of a vehicle based on reasonable suspicion that the occupants of the vehicle are engaged in criminal activity.  **See *Terry v. Ohio***, 392 U.S. 1, 25-31 (1968).  Thereafter, Trooper Hayes worked diligently to confirm or dispel his suspicions in a short period of time.  **See *United States v. Bell***, 183 F.3d 746, 749 (8th Cir. 1999).  Trooper Hayes was concerned that he was faced with a stolen vehicle, that the occupants were connected to drug trafficking, and that the occupants were illegal aliens.  Trooper Hayes made telephone calls to the Colorado State Police based on the card provided to him by the pickup's occupants, he called the rental company and spoke to a representative who stated the pickup was overdue, he spoke to a private investigator hired by the rental company, he contacted NSP drug investigators concerning the previous alert and requested a canine to come to the scene, and he contacted agents from ICE to come to the scene and interview the occupants concerning their alienage. The length of the detention of the occupants of the pickup after the traffic stop was not unreasonable in light of the numerous unknowns faced by Trooper Hayes.  Both individuals were detained at the roadside scene until Agent Hooper from ICE arrived, interviewed them, and then placed them in custody.  Trooper Hayes had not finished his investigation at that point.  Valera-Ramirez's and Lizarraga-Castro's assertions that they were illegally detained pending their being placed in custody for immigration violations is without merit.

### C.  The Defendants' Arrest

Agent Hooper, an immigration official, may "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States."  8 U.S.C. § 1357(a)(1). Agent Hooper's interrogation of Valera-Rivera and Lizarraga-Castro led to the conclusion that both individuals were in the United States illegally.  Apart from the assertion that their detention by Trooper Hayes was illegal after the traffic stop, there is no assertion that Agent Hooper's interrogation was illegal.  Valera-Rivera's and Lizarraga-Castro's statements to Agent Hooper that they were in the United States without permission provided Agent Hooper probable cause to place both individuals under arrest for being in the United States illegally.

### D.  Search of the Pickup
#### i.  Standing

To claim Fourth Amendment protection, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.  ***Minnesota v. Carter***, 525 U.S. 83, 88 (1998); ***United States v. Lyton***, 161 F.3d 1168, 1170 (8th Cir. 1998).  The reasonableness of the expectation of privacy "must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." ***Rakas v. Illinois***, 439 U.S. 128, 143-44 n.12 (1978); **see also** ***Smith v. Maryland***, 442 U.S. 735, 740-41 (1979).  "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally."  ***United States v. Stallings***, 28 F.3d 58, 60 (8th Cir. 1994) (**quoting** ***United States v. Gomez***, 16 F.3d 254, 256 (8th Cir. 1994)).  "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched."  ***Gomez***, 16 F.3d at 256.  The Eighth Circuit has recognized that:

> The Supreme Court has enunciated a two part test to determine whether a person has a legitimate expectation of privacy in the place searched or the object seized.  A court must determine: (1) whether the petitioner has asserted a subjective expectation

>of privacy, and (2) whether the petitioner's subjective expectation is objectively reasonable.

*Stallings*, 28 F.3d at 60 (internal citations omitted). "Because Fourth Amendment rights are personal and may not be asserted vicariously, we must first determine whether [the defendant] had a legitimate expectation of privacy in the area searched or the item seized." *Gomez*, 16 F.3d at 256 (internal citations omitted). The Eighth Circuit has explained:

>Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*Id.* (internal citation omitted).

Defendant Lizarraga-Castro has not established that, as a passenger in the pickup, he has any standing to object to the search of the pickup. His motion should be denied on that basis. Valera-Rivera, being the driver of the pickup and having his name listed on the rental agreement as an additional driver, provides sufficient standing for him to challenge the validity of the search.

### ii. Consent

Both Valera-Rivera and Lizarraga-Castro signed a permission to search form after the form was explained to them in Spanish by Agent Hooper and after they were informed they did not have to provide such permission. Consequently, both Valera-Rivera and Lizarraga-Castro consented to the search of the pickup. "A search may be constitutionally valid either where it is supported by a reasonable suspicion or by valid consent." *United States v. Morris*, 910 F. Supp. 1428, 1446 (N.D. Iowa 1995) (internal citations omitted). A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion and such "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 40 (1996). In this case both Valera-Rivera and Lizarraga-Castro were advised they did not have to consent and signed permission to

search forms after the forms were explained to them in Spanish. There is no evidence that either Valera-Rivera or Lizarraga-Castro was threatened, intimidated, or punished to sign the permission to search forms. The court finds the consents to have been voluntarily given.

### iii. Canine Alert

Alternately, the pickup could have been searched following the canine alert by Trooper Covert's drug detection dog. The canine sniff of the vehicle did not constitute a "search" within the meaning of the Fourth Amendment.

> [A] canine sniff of the exterior of personal property in a public location "is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure" that it does not constitute a "search" within the meaning of the Fourth Amendment. ***United States v. Place***, 462 U.S. 696, 707, 103 S. Ct. 2637, 77 L. Ed.2d 110 (1983) (luggage at an airport). That principle applies to the canine sniff of the exterior of [a] trailer stopped along an interstate highway. In general, "[t]he exterior of a car . . . is thrust into the public eye, and thus to examine it does not constitute a 'search.'" ***New York v. Class***, 475 U.S. 106, 114, 106 S. Ct. 960, 89 L. Ed.2d 81 (1986).

***$404,905.00,*** 182 F.3d at 647. Furthermore, a police service dog's alert to the odor of drugs in a vehicle provides probable cause that drugs are present. ***Place***, 462 U.S. at 706; ***United States v. Bloomfield,*** 40 F.3d 910, 919 (8th Cir. 1994), **cert. denied,** 514 U.S. 1113 (1995). After probable cause is established, a motor vehicle can be searched without a warrant under the automobile exception to the warrant requirement. ***Chambers v. Maroney***, 399 U.S. 42, 52 (1969).

### E. Conclusion

The court finds there was probable cause for the traffic stop, the subsequent detention of Valera-Rameriz and Lizarraga-Castro and the pickup by Trooper Hayes was reasonable in order to conduct the investigation of the status of the pickup and Valera-Ramirez's and Lizarraga-Castro's alienage, Valera-Ramirez's and Lizarraga-Castro's arrests by ICE Agent

10

Hooper were legal, Valera-Ramirez's and Lizarraga-Castro's consents to search the pickup were voluntarily given albeit Lizarraga-Castro had no standing to object to the search, and the canine sniff provided probable cause to search the pickup.  Accordingly, Valera-Ramirez's and Lizrraga-Castro's motions to suppress the evidence seized in this matter should be denied.

### IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:

1) Valera-Ramirez's motion to suppress (Filing No. 16) be denied; and
2) Lizarraga-Castro's motion to suppress (Filing No. 13) be denied.

### ADMONITION

Pursuant to NECrimR 57.3 any objection to the Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of the Report and Recommendation.  Failure to timely object may constitute a waiver of any such objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 21st day of September, 2005.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge